```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
```

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>- against -<br><br>ASIM HAMEEDI, FAWAD HAMEEDI,<br>MICHELLE LANDOY, DESIREE SCOTT, EMAD<br>SOLIMAN, and ARIF HAMEEDI,<br><br>Defendants. | 17 Cr. 137 (JGK)<br><br>MEMORANDUM OPINION &<br>ORDER |

JOHN G. KOELTL, District Judge:

The defendants, Dr. Asim Hameedi ("Dr. Hameedi"), Fawad Hameedi, Arif Hameedi, Michelle Landoy, Desiree Scott, and Dr. Emad Soliman, have been charged in an Indictment containing ten counts alleging crimes arising from an alleged conspiracy to commit healthcare fraud. The defendants have filed two motions for severance pursuant to Rule 14(a) of the Federal Rules of Criminal Procedure. Dr. Hameedi, together with Fawad Hameedi and Arif Hameedi, jointly move to sever Dr. Hameedi's trial from the trial for the remaining defendants. Separately, Dr. Soliman moves to sever his trial from the trial for the remaining defendants. The Government opposes both motions. Michelle Landoy and Desiree Scott take no position on either motion. For the following reasons, both severance motions are **denied**.

I.

The Indictment makes the following allegations.

Dr. Hameedi is an interventional cardiologist licensed to practice medicine in New York State. Indictment ¶ 1. He owned

and was the president of a medical clinic (the "Clinic") that specialized in cardiology and neurology. Indictment ¶ 2.

Fawad Hameedi, Dr. Hameedi's nephew, graduated from medical school but was never licensed to practice medicine. He was the laboratory director and practice operations manager for the Clinic. Indictment ¶ 3.

Arif Hameedi, Dr. Hameedi's brother, was employed at the Clinic. Arif Hameedi was responsible for submitting the Clinic's bills and claims to insurance companies. Indictment ¶ 7.

Michelle Landoy was a medical biller at the Clinic. She was responsible for, among other things, preparing bills and submitting reimbursement claims to insurance companies. Indictment ¶ 4.

Desiree Scott was also an employee of the Clinic. She was responsible for communicating with insurance companies to obtain preauthorization for medical tests. Indictment ¶ 5.

Dr. Soliman was a licensed neurologist who worked part-time at the Clinic from about 2002 until about 2004. Indictment ¶ 6.

The Indictment alleges that, between 2003 and 2015, the defendants engaged in a scheme to defraud Medicaid, Medicare, managed care companies, and private health insurance companies (collectively, the "Insurance Providers") by submitting fraudulent claims for reimbursement for medical tests and procedures. The Indictment charges that the fraudulent conduct

2

included making false representations to the Insurance Providers about the medical condition of patients to obtain preauthorization for medical tests and procedures and submitting false claims to the Insurance Providers for tests and procedures that were not performed and/or medically unnecessary, as well as for drug items that were not used or provided. Indictment ¶ 21. The Indictment also charges that, to hide the large volume of claims, some of which were fraudulent, the defendants falsely represented that medical tests had been ordered or performed by doctors who did not work at the Clinic or had not ordered or performed the tests. These doctors included Dr. Soliman, who allegedly agreed to allow the Clinic to submit false claims to the Insurance Providers in his name. Indictment ¶¶ 22, 39. The Indictment also charges that the defendants used various unlawful means to obtain and maintain a high volume of patients for use in the fraudulent scheme, including paying kickbacks in exchange for referrals and accessing information, without authorization, from electronic health records of patients at a hospital. Indictment ¶ 24.

Each defendant played a specific role in the alleged scheme to file false insurance claims. Dr. Hameedi, Fawad Hameedi, and Arif Hameedi allegedly oversaw the execution of this scheme. See Indictment ¶¶ 26-29. Desiree Scott allegedly placed phone calls to the Insurance Providers and represented that she was calling

3

on behalf of doctors not named in the Indictment when in fact she transferred the phone calls to Dr. Hameedi or Fawad Hameedi. Indictment ¶¶ 34, 60(e), (h). After receiving a transferred phone call from Scott, Dr. Hameedi and Fawad Hameedi allegedly impersonated the unnamed doctors and provided false patient information in the phone calls with the Insurance Providers. Indictment ¶¶ 60(c), (d), (f), (g). Dr. Soliman allegedly allowed other defendants to impersonate him and to use his name to file reimbursement claims for tests that he did not perform or order. Indictment ¶¶ 22, 60(i). Arif Hameedi and Michelle Landoy allegedly filed false claims with the Insurance Providers listing doctors who did not work at the Clinic as the providers who ordered the tests. Indictment ¶¶ 22, 35.

The Indictment also contains various allegations about unnamed co-conspirators. See, e.g., Indictment ¶ 52(b). One of those co-conspirators, identified in the Indictment as "CC-1," allegedly helped Dr. Hameedi count the number of referred patients, helped Dr. Hameedi "take care of" referral doctors, wrote checks, and handled cash in furtherance of the kickback scheme. Indictment ¶¶ 52(a), (b), (c), (e). The Indictment also alleges that CC-1 obtained Dr. Soliman's agreement to use his name in falsified insurance claims. Indictment ¶ 60(i).

The Indictment contains ten counts. Count One charges all defendants with conspiracy in violation of 18 U.S.C. § 1349 to

4

commit healthcare fraud in violation of 18 U.S.C. § 1347 and wire fraud in violation of 18 U.S.C. § 1343. Count Two charges all defendants with healthcare fraud in violation of 18 U.S.C. §§ 1347 and 2. Count Three charges all defendants with wire fraud in violation of 18 U.S.C. §§ 1343 and 2. Count Four charges all defendants with making false statements relating to healthcare matters in violation of 18 U.S.C. §§ 1035 and 2.

Counts Five through Eight charge more limited conspiracies involving fewer than all of the defendants. Count Nine charges Dr. Hameedi, Landoy, and Scott with aggravated identity theft in violation of 18 U.S.C. §§ 1028A and 2. Count Ten charges Dr. Soliman with making false statements to a federal agent in violation of 18 U.S.C. § 1001(a).

## II.

Rule 14 of the Federal Rules of Criminal Procedure provides, in relevant part, that "[i]f the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." The Supreme Court teaches that "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from

making a reliable judgment about guilt or innocence." Zafiro v. United States, 506 U.S. 534, 539 (1993).

There is a preference for joint trials in the federal system for defendants who are indicted together. Joint trials promote efficiency and promote the interests of justice by, among other means, avoiding inconsistent verdicts. Id. at 537. Thus, a defendant seeking such a severance "must show that he [will be] so severely prejudiced by the joinder as to [be] denied a fair trial, not that he might have [] a better chance for acquittal at a separate trial." United States v. Torres, 901 F.2d 205, 230 (2d Cir. 1990) (citations and internal quotation marks omitted); see also United States v. Sattar, 314 F. Supp. 2d 279, 317 (S.D.N.Y. 2004). Even when the risk of prejudice is high, before granting a motion for severance a court should consider whether less drastic measures, such as limiting instructions, may cure any potential prejudice and suffice. Zafiro, 506 U.S. at 539.

In deciding a motion for severance, a court must consider, among other factors: (1) possible conflicts between defense theories, (2) the possibility that the moving defendant will be prejudiced by a joint trial, and (3) the complexity of a joint trial, including the number of defendants, the estimated trial length, disparities in proof offered against the various defendants, and the defendants' differing roles in the alleged

6

criminal schemes. See United States v. Guillen-Rivas, 950 F. Supp. 2d 446, 457 (E.D.N.Y. 2013).

The case for severance is stronger when defendants in a joint trial will assert "mutually antagonistic defenses." United States v. Yousef, 327 F.3d 56, 151 (2d Cir. 2003). "Defenses are mutually antagonistic when accepting one defense requires that 'the jury must of necessity convict a second defendant.'" Id. (quoting United States v. Cardascia, 951 F.2d 474, 484 (2d Cir. 1991)). But mutually antagonistic defenses are not "prejudicial per se" and do not always require severance. Id. (quoting Zafiro, 506 U.S. at 538). A district court may be able to use in its jury instructions to cure any harm caused by a joint trial with mutually antagonistic defenses. Zafiro, 506 U.S. at 540; see Yousef, 327 F.3d at 151 (providing an example of jury instructions that cured any possible prejudice in a joint trial with antagonistic defenses).

A danger of "prejudicial spillover," where evidence which would be inadmissible against one defendant if tried individually could be introduced in a joint trial, could also provide a basis for a severance. Hence, a severance could be warranted where "evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that defendant was guilty." Zafiro, 506 U.S. at 539 (citing Kotteakos v. United States, 328 U.S. 750, 774-75 (1946)). However, claims

7

of prejudicial spillover rarely succeed, particularly in the context of conspiracy cases because the evidence could be admitted in the separate trials. See United States v. Muyet, 945 F. Supp. 586, 596 (S.D.N.Y. 1996); see also United States v. Rittweger, 259 F. Supp. 2d 275, 285 (S.D.N.Y. 2003), aff'd, 524 F.3d 171 (2d Cir. 2008) (Sotomayor, J.).

### III.

Dr. Hameedi, together with Fawad Hameedi and Arif Hameedi, argue that Dr. Hameedi should be severed because he intends to raise defenses that are antagonistic to those of his co-defendants, his trial will contain evidence that would be inadmissible and prejudicial if it were entered against his co-defendants, and he seeks to proceed to trial earlier than his co-defendants. Dr. Soliman's arguments for severance echo Dr. Hameedi's. Dr. Soliman asserts that he will suffer from spillover prejudice if tried with the other defendants because he was not involved in the entire scheme and that his trial arguments will be antagonistic to the remaining defendants because he will argue that he was victimized by the fraudulent scheme, rather than conspiring to perpetrate it.

### A.

Dr. Hameedi, Fawad Hameedi, and Arif Hameedi identify the following four potential conflicting defenses: (1) Dr. Hameedi will argue that he relied in good faith on the expertise of

8

Michelle Landoy and Arif Hameedi in the filing of insurance claims and therefore lacked actual knowledge of their fraud, whereas Landoy and Arif Hameedi will argue that they relied on Dr. Hameedi's medical expertise in filing the fraudulent claims; (2) Desiree Scott, Fawad Hameedi, and Landoy will argue that they could not have intended to commit fraud because they acted at the direction of Dr. Hameedi, whereas Dr. Hameedi will argue that the other defendants committed fraud without his knowledge or consent; (3) Dr. Hameedi will argue that, unbeknownst to him, Scott and Fawad Hameedi engaged in a scheme in which Fawad Hameedi impersonated Dr. Hameedi on telephone calls, whereas Fawad Hameedi and Scott will argue that Dr. Hameedi directed the impersonation schemes; and (4) Fawad Hameedi will argue at trial that Dr. Hameedi directed him to access unlawfully confidential patient information, whereas Dr. Hameedi will argue that Fawad did so on his own initiative and without Dr. Hameedi's knowledge. Dr. Soliman asserts that his defense at trial will conflict with the defenses raised by his co-defendants' because he will assert that he was a victim of their fraud.

The conflicts identified by the moving defendants do not require severance. Indeed, the defenses do not rise to the level of truly "antagonistic defenses" because none requires a jury to convict the other defendants. The defenses identified by the movants address the subjective intent or knowledge of the

9

defendants. It is not a necessary element of a defense of lack-of-knowledge or lack-of-intent for a defendant to argue that someone else intended to commit a fraud. It is possible for the jury to find that the Government failed to adduce evidence sufficient to prove beyond a reasonable doubt that any defendant had the subjective knowledge or intent to commit the crimes charged.

All of the defendants can argue that they acted in good faith without knowledge that what they were doing was fraudulent, whether or not they relied on the statements of their co-defendants. And promoting the alleged fraudulent intent of their co-defendants would do little to promote their own defenses because their defenses depend on their own good faith and lack of fraudulent intent, not the existence of fraudulent intent by their co-defendants.

Moreover, Dr. Hameedi has suggested he will argue that CC-1 was, in essence, the mastermind of the fraudulent scheme on whom Dr. Hameedi and the other defendants relied. At a bail hearing held on March 1, 2017, Dr. Hameedi indicated that he believed CC-1 played a larger role in the fraudulent scheme than the Indictment alleges. Br. for Gov't Ex. A, at 20. Dr. Hameedi argued that CC-1 is the former director of the Clinic's medical practice, and that it was CC-1, not Dr. Hameedi, who managed the office practices, administration, and billing procedures. Dr.

Hameedi asserted that CC-1 is ultimately responsible for the fraudulent scheme. Id. Dr. Hameedi reiterated this view in a letter addressed to Magistrate Judge Netburn dated March 6, 2017. Br. for Gov't Ex. B, at 5.

Placing the blame on CC-1 is not at all antagonistic to Dr. Hameedi's co-defendants. Rather, this theory suggests that Dr. Hameedi lacked actual knowledge of or intent to commit fraud while placing the ultimate blame for the alleged fraud on an unindicted co-conspirator. A jury therefore would be able to accept this CC-1 theory without having to convict any of Dr. Hameedi's co-defendants.

In the end, the conflicts identified by Dr. Hameedi and Dr. Soliman amount to common issues that often recur in conspiracy trials. The movants seek severance essentially on the ground that they will argue that they are not guilty because they were duped by other members of the conspiracy. The Second Circuit Court of Appeals has repeatedly rejected "fingerpointing" arguments of this sort as a basis for severance. See United States v. Villegas, 899 F.2d 1324, 1346 (2d Cir. 1990) ("The mere fact that codefendants seek to place the blame on each other is not the sort of antagonism that requires a severance."). For example, in United States v. Cardascia, the Court of Appeals rejected a defendant's argument that severance was warranted because he had been "defrauded" by his co-

11

conspirators into participating in the fraudulent scheme. 951 F.2d at 485. The court explained that such a defense "plainly is typical of co-conspirator trials and does not warrant severance." Id. Similarly, in United States v. Harwood, 998 F.2d 91 (2d Cir. 1993), the Court of Appeals affirmed the denial of a motion for severance by two defendants who were arrested after the police found illegal narcotics in a van in which the defendants were traveling. Id. 93-94. Each defendant argued that he did not know of the narcotics in the van and that the other defendant must have placed the narcotics there. Id. at 95-96. Still, the court found no cognizable prejudice in trying the two defendants together. Id. at 96. The arguments by Dr. Hameedi and Dr. Soliman are indistinguishable from these typical defenses in conspiracy cases.[1]

Severance is also not the appropriate remedy for any prejudice asserted by the defendants resulting from allegedly antagonistic defenses. It is well established that a court can cure prejudice caused by allegedly antagonistic defenses through the use of jury instructions. E.g., Yousef, 327 F.3d at 151-52; United States v. Salameh, 152 F.3d 88, 116-17 & n.3 (2d Cir.

---

[1] Dr. Hameedi's reliance United States v. Serpoosh, 919 F.2d 835 (2d Cir. 1990), is misplaced. The Court of Appeals has recognized that Serpoosh was overruled by Zafiro. United States v. Haynes, 16 F.3d 29, 31-32 (2d Cir. 1994). Indeed, the defendants have cited no case in the twenty-four years since Zafiro was decided in which the Second Circuit Court of Appeals concluded that severance should have been granted based on the existence of allegedly antagonistic defenses.

12

1998); see also United States v. Sattar, 272 F. Supp. 2d 348, 380 (S.D.N.Y. 2003). The Court will deliver the necessary instructions in this case to assure that the jury considers the evidence against each defendant separately.

**B.**

Dr. Hameedi, Fawad Hameedi, and Arif Hameedi also argue that Dr. Hameedi's trial should be severed from the trial of the remaining defendants because he plays such a central role in the allegedly fraudulent scheme such that evidence admitted against him at a joint trial would prejudice the other defendants. Dr. Hameedi does not argue that evidence properly admitted against his co-defendants would prejudice him. Dr. Soliman's argument for severance is similar. Dr. Soliman asserts that he will suffer unfair prejudice if tried with his co-defendants because his is only alleged to have played a minor role in the fraudulent conspiracies.

Dr. Hameedi's argument fails from the outset with regard to Michelle Landoy and Desiree Scott. These two defendants do not join Dr. Hameedi's severance motion to discuss the prejudice they would suffer at a joint trial. The Court therefore cannot conclude that any evidence against Dr. Hameedi would prejudice Landoy or Scott so much that it would compromise a specific trial right or cause the jury to render an unreliable verdict. See Zafiro, 506 U.S. at 539.

Dr. Soliman, Fawad Hameedi, and Arif Hameedi argue that they will suffer unfair spillover prejudice if tried alongside Dr. Hameedi because the Indictment portrays them as relatively minor participants in the fraud. This argument also is unavailing. Virtually all multi-defendant conspiracy cases involve one or more defendants who occupied minor roles in a conspiracy. That fact alone is insufficient to establish prejudice serious enough to warrant severance. "[I]t is well established that defendants who played a minor role in a conspiracy may be tried with those who played a larger or dominant role." United States v. Ferrarini, 9 F. Supp. 2d 284, 290 (S.D.N.Y. 1998) (citing Cardascia, 951 F.2d at 483).

In any event, little if any evidence that will be admitted against Dr. Hameedi will be unfairly prejudicial to Fawad Hameedi, Arif Hameedi, and Dr. Soliman because those three defendants are all charged with Dr. Hameedi in the first three counts of the Indictment that charge the overarching conspiracy to commit healthcare fraud and wire fraud and with the substantive crimes of healthcare fraud and wire fraud. All four defendants are also charged in Count Four of the Indictment, which charges them with having made false statements relating to healthcare matters. There is thus little risk that any evidence of fraud against Dr. Hameedi would be inadmissible in a separate trial against the remaining defendants. Rather, most, if not

14

all, of the evidence of Dr. Hameedi's participation in the fraud will likely be admissible against the other defendants -- his alleged co-conspirators.

The Court will also ensure that it gives appropriate limiting instructions to assure that if any evidence is admissible only as to some defendants, the jury is instructed accordingly. This is not a case in which the nature of the evidence against one or more defendants includes inflammatory allegations that are different in kind from the type of evidence that can be admitted against other defendants. There is no reason to believe that the jury could not follow appropriate limiting instruction. See, e.g., Rittweger, 524 F.3d at 179-80 (affirming the denial of severance motion even when neither defendant had knowledge of the other's criminal conspiracy and the "evidence relating to [one scheme was] not strictly necessary to understanding the intent of the [other scheme]" because "the evidence with respect to each of the defendants was sufficiently straightforward that the jury could consider it without any significant spillover effect" and "the district court gave limiting instructions throughout the trial").[2]

---

[2] Dr. Soliman cites United States v. Spinelli, 352 F.3d 48 (2d Cir. 2003), for the proposition that there are "cases in which the sheer volume and magnitude of the evidence against one defendant so dwarfs the proof presented against his co-defendant that a severance is required to prevent unacceptable spillover prejudice." Id. at 55. But the court then held that "the case before us is not such a case" "especially so since the district court explicitly instructed the jury to consider the defendants individually." Id.

15

## C.

Finally, Dr. Hameedi argues that severance is required because he will be ready for trial far earlier than his co-defendants. Dr. Hameedi advances this argument for the first time more than sixth months after he was charged. That delay casts doubt on the urgency with which Dr. Hameedi asserts his request for a speedy trial.

In any event, the Court has established a reasonable, March 2018 trial date for all defendants. That trial date gives the defendants more than a year following the Indictment to prepare for trial. None of the defendants objected to the trial date or asseted tha they could not be ready for trial on that schedule. To the extent the defendants have a specific reason for needing additional time to prepare, they can make a motion for an extension of time, and the Court will consider it.

## CONCLUSION

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit. For the foregoing reasons, both motions for severance are **denied**.[3] The Clerk is directed to close the motions at docket numbers 97 and 100.

**SO ORDERED.**

**Dated:** **New York, New York**
**November 3, 2017**

_____
John G. Koeltl
United States District Judge

---

[3] United States v. Shkreli, 15-cr-637 (KAM), 2017 WL 4019387 (E.D.N.Y. Apr. 19, 2017), does not suggest a different result. There, the district court found that the two defendants seeking severance did not plan to advance mutually antagonistic defenses and that there was no serious risk of spillover prejudice. Id. at *3-*6. The court found that severance was required because the unique facts of that case threatened to undermine the constitutional right to a fair trial. Id. at *6. Because the legal and factual issues presented here are sufficiently different from those in Shkreli, the decision in that case provides little guidance for the disposition of the current severance motions.