UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

      - against -

ASIM HAMEEDI,

              Defendant.

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4/20/21

17-cr-137-1 (JGK)

MEMORANDUM OPINION
AND ORDER

**JOHN G. KOELTL, District Judge:**

The defendant, Asim Hameedi ("Dr. Hameedi"), pleaded guilty
to a superseding information charging him with one count of
conspiracy to commit health care fraud in violation of 18 U.S.C.
§ 1347 by participating in a scheme to defraud insurance
providers by making materially false statements in requests for
preauthorization for medical tests and procedures and in claims
for payment for the provision of medical services and drug
items. The bulk of the scheme consisted of submitting requests
for preauthorization for payments in the names of doctors who
did not perform the services, although services were actually
performed by other credentialed physicians. The total amount of
these fraudulently billed services was $6,316,845. In addition,
$554,331 was billed to insurance companies based on false claims
for two-component nuclear stress tests purportedly performed
when in fact only one component was completed. The total amount
of the proceeds of the fraud was $6,871,176. All of the
proceeds of the fraud were billed by and received by City
Medical Associates ("CMA"), a cardiology and neurology clinic in

1

Queens, New York. Dr. Hameedi was the President of CMA and the majority owner of the corporation throughout its existence. Pre-Sentencing Report ("PSR") ¶ 15. He had a profit-sharing agreement with Dr. Abasar Haaris ("Dr. Haaris") by which Dr. Hameedi obtained 65% of the profits of CMA, and Dr. Haaris obtained 35%. Fatico Hr'g Tr. ("Tr.") 31.

The information also contains a forfeiture allegation pursuant to 18 U.S.C. § 982(a)(7) in which the Government seeks to require the defendant to "forfeit to the United States . . . any and all property . . . that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of [the conspiracy to commit health care fraud in violation of 18 U.S.C. § 1347] including but not limited to . . . the amount of proceeds traceable to the commission of said offense that the defendant personally obtained."

The Government contends that Dr. Hameedi should forfeit to the Government the entire amount of the proceeds of the fraud, namely $6,871,176, because he allegedly "controlled" CMA, the recipient of the proceeds of the fraud. The defendant contends that the Government has failed to prove by a preponderance of the evidence that Dr. Hameedi is liable for forfeiture because he did not personally "acquire directly or indirectly" the proceeds of the fraud, and any control he exercised over CMA was

insufficient to hold him responsible for forfeiture of the proceeds of the fraud.

To resolve any issues of fact, the Court held an evidentiary hearing on October 28, 2020, and now makes the following findings of fact and reaches the following conclusions of law.

## FINDINGS OF FACT

In about 2002, Dr. Hameedi became the President of CMA, a cardiology and neurology clinic, in Queens, New York, that had been started by Dr. Hameedi's brother who had recently died. Tr. 85. Dr. Hameedi also became the majority owner of CMA. In about 2003, Dr. Hameedi invited Dr. Haaris to partner with him at CMA and Dr. Haaris and Dr. Hameedi entered into a profit-sharing agreement by which Dr. Hameedi earned 65% of the profits and Dr. Haaris earned 35% of the profits. Tr. 30-31, 87.

CMA used two buildings in Queens—213-18 Union Turnpike and 216-12 Union Turnpike—in which Dr. Hameedi and Dr. Haaris each had ownership interests. Tr. 29. Dr. Hameedi owned 65% of the 216-12 Union Turnpike building, and Dr. Haaris owned 35%. Tr. 29-30. Dr. Hameedi, Dr. Haaris, and Dr. Arif Hameedi each owned a 33.3% interest in the 213-18 Union Turnpike Building. Id.

From 2003 through 2015, CMA became a substantial medical practice. At its height, CMA had between 30 and 35 employees Tr. 99. CMA was a multi-specialty medical practice, that

3

employed as many as six doctors. Id. CMA also employed several physician assistants who also treated patients. Tr. 98. The practice generated between $8 million and $10 million in annual revenue between 2010 and 2015. Tr. 99-100.

The Government does not dispute that, apart from the fraudulent conduct at issue to which Dr. Hameedi pleaded guilty, CMA was a legitimate medical practice that provided necessary medical care to thousands of patients for more than a decade. CMA maintained bank accounts in its own name at Chase Bank, a bank account ending in 4965 (the "4965 Account") on which Dr. Hameedi and his brother were the authorized signatories, and a bank account ending in 7365 (the "7365 Account") on which Dr. Hameedi and Dr. Haaris were co-signatories. Tr. 45-47. CMA signed leases in its own name, maintained its own financial records and bookkeeping and records, and filed tax returns.

Dr. Hameedi's primary role at CMA was patient care and Dr. Haaris managed the office. Tr. at 193, 202. Dr. Haaris had the discretion to manage CMA's $4 million payroll and oversaw nearly three dozen employees. Tr. 113. While Dr. Hameedi was the President of CMA, Dr. Haaris frequently held himself out as the President of CMA and signed various documents as the President of CMA. Tr. 102, 133-34, 136, 140-41. While Dr. Hameedi focused on patient care, Dr. Haaris had considerable discretion in managing CMA's operations including purchasing equipment, adding

4

leases and satellite offices, hiring and firing personnel and managing the payroll. Tr. 113-117.

While Dr. Haaris had signing authority for the 7365 Account, Dr. Hameedi, monitored the bank statements. Tr. 62. Dr. Hameedi, CMA's majority shareholder, provided capital for CMA, and those funds were recorded as shareholder loans to the company. Dr. Hameedi signed three checks made out to himself from the 4965 Account in the total amount of nearly $700,000. Tr. 45-46. The checks are properly characterized as reimbursements for shareholder loans. In addition, Dr. Hameedi caused various payments to be made from the 7365 Account, including checks amounting to nearly $200,000, and checks for various personal expenses such as clothing, parking, residential taxes and payments, landscaping, and college savings for his children. Tr. 60-62, 73-80.  It is undisputed that the total of payments for personal expenses never exceeded the hundreds of thousands of dollars of shareholder loans that Dr. Hameedi made to CMA. Arg. Tr. 21.

The Government concedes that there is no evidence that CMA ignored corporate formalities. Arg. Tr. 17. The Government also concedes that there is no evidence that Dr. Hameedi "misappropriated" CMA funds for personal use. Id. at 21-22. Finally, the Government has not attempted to argue that CMA was an "alter ego" of Dr. Hameedi. Id. at 17.

The total amount of the fraudulent proceeds obtained by CMA in this case was $6,871,176, which amounted to approximately 14.9% of CMA's total revenue of approximately $47,420,916 between 2010 and 2015. Tr. 112. At the same time, Dr. Hameedi's total income from CMA was $9,783,000.

There was no evidence that the payments by insurance companies were handled other than in the ordinary course of the business of CMA - they went into the CMA accounts and funded all of the expenses of CMA including the salaries and other expenses of CMA including the salaries and income of Dr. Haaris and Dr. Hameedi.

## CONCLUSIONS OF LAW

The Government seeks to have Dr. Hameedi forfeit to the United State the entire proceeds of the fraud that was obtained by CMA, namely $6,871,176. The Government argues that because Dr. Hameedi allegedly controlled CMA, he is liable for the entire proceeds of the fraud. The Government must prove the nexus between the offense and the forfeiture request by a preponderance of the evidence. See United States v. Peters, 732 F.3d 93, 98 (2d Cir. 2013); United States v. Capoccia, 503 F.3d 103, 110 (2d Cir. 2007).[1]

The criminal forfeiture provision pursuant to which the Government seeks forfeiture from Dr. Hameedi provides that "in

---

[1] Unless otherwise noted, this Memorandum Opinion and Order omits all citations, alterations, emphasis, and internal quotation marks in quoted text.

imposing sentence on a person convicted of a Federal health care offense, [the court] shall order the person to forfeit property . . . that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense." 18 U.S.C. § 982(a)(7). 18 U.S.C. § 982(b)(1) makes the provisions of 21 U.S.C. § 853 (except section 853(d)) applicable to 18 U.S.C. § 982. See, e.g., United States v. Jafari, 85 F. Supp. 3d 679, 685 (W.D.N.Y. 2015). Therefore, property subject to criminal forfeiture under this provision is defined as "any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation." 21 U.S.C. 853(a)(1).

Section 853(a)(1) makes clear that forfeiture is limited to property that the defendant obtained, directly or indirectly, as a result of the offense. In Honeycutt v. United States, 137 S. Ct. 1626 (2017), the Supreme Court recently rejected the application of joint and several liability to a defendant who did not obtain proceeds of a controlled substance offense, even though the defendant was an employee of a firm that benefited from the violation. The Court explained the importance of the verb "obtain" in Section 853(a)(1): "Neither the dictionary definition nor the common usage of the word 'obtain' supports the conclusion that an individual 'obtains' property that was acquired by someone else . . . . Section 853(a)(1) further

provides that the forfeitable property may be 'obtained, directly or indirectly.' The adverbs 'directly' and 'indirectly' modify—but do not erase—the verb 'obtain.' In other words, these adverbs refer to how a defendant obtains the property; they do not negate the requirement that he obtain it at all." Id. at 1633.

The Court of Appeals for the Second Circuit has acknowledged that it has "not yet fully defined the parameters of Honeycutt," but it made clear that Honeycutt's bar to joint and several liability applies only to co-conspirators who never possessed the tainted proceeds of their crimes. See United States v. Tanner, 942 F.3d 60, 67-68 (2d Cir. 2019). Forfeiture could be obtained from each of the co-conspirators in Tanner who "acquired" the full proceeds of the crimes at issue, namely honest services fraud and Travel Act crimes. Id. at 68. In United States v. Bergstein, 788 F. App'x 742, 748 (2d Cir. 2019), the Court of Appeals also reaffirmed its prior holding in United States v. Contorinis, 692 F.3d 136, 147 (2d Cir. 2012), that "[f]or the purposes of forfeiture under 18 U.S.C. §981(a)(1)(C), 'acquired' property 'need not be personally or directly in the possession of the defendant' as long as 'at some point, [it had] been under the defendant's control." In Bernstein, a case involving various fraud offenses, the Court of Appels affirmed an order of forfeiture because the Court found

sufficient "control" where the defendant "effectively controlled the [fraudulent proceeds] as he was able to transfer the funds to shell companies and use the funds for personal expenses." 788 F. App'x at 748. In Contorinis, the Court of Appeals vacated an order of forfeiture against a portfolio manager of an investment fund who was convicted of securities fraud and insider trading because the defendant was only an employee and small equity owner of the investment fund, and the defendant could not be ordered to forfeit profits "that he never received or possessed." 692 F.3d at 145. The Court of Appeals stressed that the purpose of criminal forfeiture is to punish a defendant by removing the defendant's "ill-gotten gains." Id. at 146.

The closest analogous case, United States v. Peters, 732 F.3d 93 (2d Cir. 2013), predates Honeycutt. In Peters, the Court of Appeals affirmed a judgment of forfeiture pursuant to 18 U.S.C. § 982(a)(2) against a defendant who was guilty of various offenses, including bank fraud, for obtaining bank loans based on misleading statements. The proceeds of the loans went to companies in which the defendant and his wife held a 98% ownership interest.  The district court had held, after a lengthy trial, that the defendant indirectly "obtained" the proceeds of the fraud because the companies were the alter egos of the defendant for purposes of "piercing the corporate veil" pursuant to New York law.  732 F.3d at 102.  The Court of

Appeals found that, while it was unnecessary for the Government to satisfy the state law requirements for piercing the corporate veil in order to establish that the proceeds were "indirectly" obtained under the forfeiture statute, the "principles of alter ego liability . . . may be relevant to the question of whether an individual indirectly obtained the proceeds of his or her criminal conduct through a corporation." Id. at 103. The Court "conclude[d] that, in the context of a criminal forfeiture, proceeding under section 982, an individual 'obtains' proceeds 'indirectly' through a corporation when the individual 'so extensively controls,' or 'dominates' the corporation and its assets that money paid to the corporation was effectively under the control of the individual." Id. at 103-04. Factors that the Court thought were "relevant to this question include the individual's ownership interest; the level of control he exercised over the company; his authority to direct the disposition of corporate assets and the degree to which he exercised that authority; and the use of corporate assets for his personal expenses." Id. at 104.

While admittedly a close question, the Government has failed to prove by a preponderance of the evidence that Dr. Hameedi directly or indirectly obtained the proceeds of the fraud, such that they are subject to forfeiture under 18 U.S.C. § 982(a)(7).

There is no evidence to prove that Dr. Hameedi directly obtained the proceeds of the fraud. There is no evidence that the allegedly fraudulent payments by insurance companies, which accounted for only roughly 14.9% of the total revenues of CMA, were handled other than in the ordinary course of the business of CMA. This is not a case like Bergstein, where the defendant funneled fraudulent funds from a corporation into separate entities controlled by the defendant. And there is no evidence that the profits Dr. Hameedi earned from CMA were other than his share of the profits of the enterprise as a whole or that they were funded specifically by the fraudulently obtained insurance payments. And the Government has not attempted to show that Dr. Hameedi misappropriated any funds from CMA.

Accordingly, the Government's theory is that Dr. Hameedi obtained the proceeds indirectly. However, the Government has failed to prove that Dr. Hameedi so extensively controlled or dominated CMA that the fraudulently obtained insurance payments made to CMA were effectively under his control and thus indirectly obtained by him. While Dr. Hameedi was the President of CMA, held a majority interest in CMA and had a right to 65% of the profits, he ceded the day-to-day management of CMA to Dr. Haaris who also held himself out as the President of CMA from time to time. Furthermore, the Government failed to show that Dr. Hameedi exercised day-to-day control over the assets. While

Dr. Hameedi was a signatory on the main bank account for CMA, so was Dr. Haaris, and Dr. Haaris took care of supervising the payroll for CMA and other expenses. While CMA did pay personal expenses for Dr. Hameedi, there is no evidence that the personal expenses were not properly accounted for by CMA and there is no evidence that the payments to Dr. Hameedi ever exceeded the amount of loans that Dr. Hameedi made to CMA. Accordingly, the government failed to show that Dr. Hameedi used CMA as his personal piggy bank. There is no evidence that Dr. Hameedi could have syphoned off the $6,871,176 for his personal use.

In the criminal proceeding against Dr. Haaris before Judge Rakoff, the Government also sought to impose a forfeiture order for the full amount of $6,871,176. Judge Rakoff found that Dr. Haaris did not exercise sufficient control over the funds to justify holding him jointly and severally liable under Honeycutt. United States v. Haaris, No. 16-CR-756, 2020 WL 5259927, at *3 (S.D.N.Y. Sept. 3, 2020). The Government fares no better against Dr. Hameedi.

## CONCLUSION

For the reasons explained above, at the time of sentencing, the Court will decline to impose an order of forfeiture.

The Clerk is directed to close docket numbers 439 and 440.

**SO ORDERED.**

Dated:    **New York, New York**
                **April 20, 2021**

                                    **John G. Koeltl**
                          **United States District Judge**